IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 02-cv-01239-MSK-PAC

MARK JORDAN,

        Plaintiff,

v.

MICHAEL V. PUGH,
J. YORK,
R.E. DERR,
B. SELLERS, and
STANLEY ROWLETT,

        Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

The Plaintiff, Mark Jordan, is an inmate in the custody of the Federal Bureau of Prisons, Administrative Maximum Unit ("ADX"), in Florence, Colorado.  In this lawsuit, Mr. Jordan challenges the constitutionality of 28 C.F.R. § 540.20(b), a prison regulation which provides that an "inmate may not act as reporter or publish under a byline."  He claims that this regulation is unconstitutional in violation of the First Amendment to the United States Constitution.

All Defendants are ADX employees named in their official capacities.  Consequently, the action is deemed to be one against the Bureau of Prisons ("the BOP").  *See Hafer v. Melo,* 502 U.S. 21, 25 (1991), *citing Kentucky v. Graham,* 473 U.S. 159, 165 (1985).

Based upon the evidence presented at trial,[1] the arguments of counsel, and the facts stipulated to by the parties (**#324**), the Court finds and concludes as follows.

## I.  Issues Presented

There are two issues presented.  The first issue is whether Mr. Jordan has standing to challenge the constitutionality of 28 C.F.R. § 540.20(b) on his own behalf and on behalf of others.  If Mr. Jordan has standing, the second issue is whether 28 C.F.R. § 540.20(b) violates the First Amendment to the United States Constitution.

It is, perhaps, also helpful to recite what is not being considered in this action.  First, the Court is not determining the wisdom of any BOP policy.  The Court defers to the judgment and expertise of prison officials with regard to penological objectives and the costs and benefits associated with meeting such objectives because these are derived from the "expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government."  *Procunier v. Martinez,* 416 U.S. 396, 405 (1974).  Second, the Court does not consider the content of any writing published by Mr. Jordan, or express any opinion as to whether his writings or those of other inmates should be published.

## II.  Findings of Fact

The BOP operates federal prisons and detention facilities.  In such facilities, it regulates inmate behavior through Regulations, Institution Supplements, Operations Memoranda, Program

---

[1] Trial was to the bench.  The Court received Exhibits 1, 2, 6, 11, 23, 31, 47, 48, 50 (pages 3-5), 51, 52, 59, 134, and 138 at trial.  The Court also conditionally received Exhibits 12, 117, 130 and 131, stating that the relevance of such exhibits would be limited to the portions referred to by witnesses or by counsel in argument.  Because no later reference was made to them, the Court cannot ascertain their relevance.

2

Statements, Program Review Guidelines, and Technical Reference Manuals.[2]

The BOP authorizes, and in some instances encourages, inmates to publish their writings.[3] For example, the BOP does not restrict or review submissions of "letters to the editor" or postings on the internet. Regulations also permit inmates to submit manuscripts (which include any form of drawing or writing, such as poetry or essays, whether fiction or non-fiction) for publication and attribution.[4] According to Program Statement No. 5350.27 (dated 7/27/99), the purpose of these regulations is "[t]o encourage inmates to use their leisure time for creative writing and to permit the direct mailing of all manuscripts as ordinary correspondence. . . . The expected result of this program is: Inmates will be afforded the opportunity to write and mail manuscripts for publication." Consistent with this Program Statement, in March 2007, ADX Warden R. Wiley approved a Leisure Library Contest in which inmates authored and submitted children's books. The winning book was then sent to the winner's family or to the local public library. The memorandum describing this contest explained that "[t]he idea behind this contest is to increase inmate involvement, reduce inmate idleness and encourage inmates to develop new skills." Manuscripts are reviewed by corrections staff prior to submission.

---

[2] *See* Program Statement No. 1221.66.

[3] For example: 28 C.F.R. § 540.10 (which states that the BOP "encourages correspondence that is directed to socially useful goals"), 28 C.F.R. § 540.14 (which addresses the handling of an inmate's incoming and outgoing general correspondence), 28 C.F.R. § 540.18 (which addresses the handling of "special mail"), 28 C.F.R. § 540.19 (which allows inmates to send and receive legal correspondence using "special mail"), 28 C.F.R. § 540.20(a) (which allows inmates to write to "representatives of the news media" using "special mail"), and 28 C.F.R. § 540.20(c) (which allows representatives of the news media to send correspondence to inmates), among others.

[4] Regulations located in 28 C.F.R. Part 551 (Miscellaneous), Subpart H (Inmate Manuscripts), specifically address inmate manuscripts.

However, 28 C.F.R. § 540.20(b)[5] provides that "The inmate may not act as reporter or publish under a byline."[6]  According to Maureen Cruz, the associate warden of operations at ADX, and John Shartle, the warden at FCI-Elkton, Ohio, this regulation prohibits inmates from publishing under a byline only in the "news media."  The BOP defines the news media as newspapers, news magazines, national and international news services, and TV and radio news programs.[7]  For purposes of this matter, the BOP is concerned only with written news media publications.

28 C.F.R. § 540.20(b) was first promulgated in 1979.  At such time, the BOP had two

---

[5] 28 C.F.R. § 540.20(b) is one of many governing the activities of inmates incarcerated in federal institutions under the direction of the BOP.  It is located in 28 C.F.R. Part 540 (Contact with Persons in the Community), Subpart B (Correspondence).  Generally, the regulations in this subpart allow correspondence by inmates with people outside of prison, and with select inmates who are in prison.  Correspondence which is authorized by regulations within Part 540 includes letters to the editors of newspapers and other publications.

[6] Violation of 28 C.F.R. § 540.20(b) is treated as a "prohibited act" which can be punished in accordance with 28 C.F.R. § 541.13.

[7] Such definition does not appear in any particular regulation, but apparently is drawn from the provisions of 28 C.F.R. § 540.2(b) which defines "representatives of the news media" as persons whose principal employment is to gather or report news for:
> a. A newspaper which qualifies as a general circulation newspaper in the community in which it is published.  A newspaper is one of "general circulation" if it circulates among the general public and if it publishes news of a general character of general interest to the public such as news of political, religious, commercial, or social affairs.  A key test to determine whether a newspaper qualifies as a "general circulation" newspaper is to determine whether the paper qualifies for the purpose of publishing legal notices in the community in which it is located or the area to which it distributes;
> b. A news magazine which has a national circulation and is sold by newsstands and by mail subscription to the general public;
> c. A national or international news service; or
> d. A radio or television news program, whose primary purpose is to report the news, of a station holding a Federal Communications Commission license.

4

justifications for the regulation.  First, by acting as a reporter or publishing under a byline in the news media, inmates could rise to undue prominence within the inmate population, thereby becoming a security risk.  Second, such activities might result in inmates conducting a business.[8] According to the evidence presented, these are continuing purposes for the regulation.

BOP witnesses testified as to three discrete security issues.   If an inmate publishes under a byline (or as a reporter) in the news media, the inmate may gain undue stature and power, thereby becoming a "big wheel," which creates supervisory and management problems.  In addition, the content of published materials can be controversial, thereby placing the authoring inmate or others at risk of physical violence.  Finally, the willingness of security staff to perform their tasks may be compromised out of fear of being included in a bylined publication.  Staff members might treat an inmate who publishes articles in the news media differently from other inmates or might guard their conduct or statements to avoid adverse public exposure.

With respect to the security concerns, the BOP regards articles published in the news media as different from other inmate publications.  Ms. Cruz testified that the news media is seen as a "purveyor of truth" or a "conduit of legitimate information."  Mr. Shartle testified that as compared to manuscripts, news media articles are published more quickly, have greater credibility and are not subject to prior staff review.  However, no historical evidence that any inmate's publications in the news media created such security problems was presented.

---

[8] In conjunction with its promulgation, a comment challenged 28 C.F.R. § 540.20(b) because it "involved an unjustified deprivation of First Amendment rights."  According to the Federal Register, 44 Fed. Reg. 35956, 35959 (June 19, 1979), the BOP responded that "such activities can result in an inmate obtaining a disproportionate prominence and influence among other prisoners which can pose a serious threat to the order of the institution.  Further, it can result in an inmate using his confined situation, and information gained thereby, to conduct a business."

These security concerns were not shared by Mr. Bair, a former prison warden and retired criminal justice professor, who testified that the "big wheel" theory had been advanced in corrections literature during the 1970s, but since then has been largely abandoned by correction officials. He further testified that there is no historical data to support the proposition that an inmate who publishes will constitute a security risk; to the contrary, correctional institutions often promote inmate writing and publishing as a rehabilitative activity, and promote inmate prominence to reward good behavior and to showcase positive role models. As to staff intimidation, Mr. Bair opined that any risk was more properly and successfully addressed by appropriate selection, supervision and training of correction officers.

Two other Regulations specifically address the BOP's security and business operations concerns. 28 C.F.R. § 540.14(a)[9] authorizes the BOP to screen all mail, including publications, coming into prisons or detention facilities, and to exclude any material that might create a security concern. Indeed, it was through implementation of this Regulation that the publications that gave rise to this lawsuit were discovered.[10] In addition, 28 C.F.R. § 541.13, Code 408 prohibits inmates from conducting a business while incarcerated.

Despite such regulations, the BOP considers 28 C.F.R. § 540.20(b) to be essential to maintain prison order and security. Mr. Shartle testified that without 28 C.F.R. § 540.20(b), there would be "a real growth among the population availing themselves of this opportunity", and that if the more than 198,000 inmates in the custody of the BOP were permitted to publish under

---

[9] 28 C.F.R. § 540.14(a) authorizes screening of general correspondence. By contrast, 28 C.F.R. § 540.18(a) authorizes screening of special mail in the inmate's presence.

[10] During mail monitoring, Barbara Sellers discovered Mr. Jordan's article in the Spring 2001 issue of Off!, and Jeff York discovered Mr. Jordan's article in the Fall 2001 issue of Off!

bylines, this would substantially increase the number of writings which staff would be required to screen.  No evidence was presented as to what news media publications are currently screened, and whether and to what degree more submissions to news media sources would result in more publications to screen or at what cost to the BOP.

During the course of this litigation, and in order to address the issues raised herein, the BOP issued policy statements in order to provide guidance as to when an inmate should be punished for violating 28 C.F.R. § 540.20(b).  On June 17, 2005, ADX-Florence promulgated Institution Supplement FLM 1480.05B.[11]  It provides:

> A column or article published under a byline alone is not prohibited conduct.  Staff shall examine the relationship between the inmate's activities and the inmate's contacts with the news media.  The activities which may be evidence of prohibited conduct, in conjunction with an inmate written byline, include but are not limited to:
>> (a)      when the inmate publishes a news article or news column in the news media - - as the term "news media" is employed in 28 C.F.R. § 540.20(b) - - on a regularly occurring basis (consistent with the news media's ordinary publication cycle, i.e., daily, weekly, quarterly, etc.).
>> (b)      when the inmate enters into a contractual or other agreement with a member of the news media for a regularly published news column or news article; or
>> (c)      when the inmate undertakes regularly occurring article or column "job" assignments with the news media.  An inmate publishes on a regularly occurring basis when his publication of articles or columns is such that it indicates a relationship or affiliation with that news media.

On October 20, 2006, Kathleen M. Kenney, Assistant Director/General Counsel for the BOP, issued a document entitled "Memorandum for Regional Directors" (hereinafter "the Kenney Memorandum").  It provides:

---

[11] This Supplement was signed on January 31, 2006.

Inmates Publishing Under Bylines
. . . .

It is the Bureau's current position that an inmate's publication of material under a byline, by itself, should not automatically be deemed a prohibited act warranting disciplinary action. Rather, there must be a factual basis for concluding the inmate's actions jeopardize the Bureau's legitimate penological interests in maintaining safe, secure, and orderly operating correctional institutions, or protection of the public.

When analyzing individual cases, staff should consider the factors listed below when considering whether disciplinary action is appropriate. As illustrated by these examples, disciplinary action should focus on inmate behavior that indicates an inappropriate relationship with news media representatives, or that indicates inappropriate business activity in the community. . . .

Factors to consider include, but are not limited to, the inmate's:
- Receiving compensation or anything of value for correspondence with a news media representative.
- Acting as a reporter on a regular or repeated basis . . . .
- Entering into a contractual, or other, agreement with a news media representative for regularly published material; or
- Contacting or corresponding with news media representatives in a manner that indicates an attempt to facilitate or maintain business activities in the     community. . . .[12]

    The Institution Supplement provides instruction for implementing the BOP's directives at

ADX. According to Paul Layer, an attorney with the BOP's Office of General Counsel, the

Kenney Memorandum provides binding guidance to all BOP staff on how to interpret and apply

---

[12] On April 17, 2007, ADX-Florence promulgated Institution Supplement FLM 1480.05C. It reaffirms that "an inmate may not be employed as, nor act as, a reporter." It then addresses when an inmate should be punished for publishing a column or article, but makes no reference to publishing under a byline. Therefore, it does not bear upon the claim at issue.

28 C.F.R. § 540.20(b).  However, neither the Institution Supplement[13] nor the Kenney

Memorandum[14] modifies 28 C.F.R. § 540.20(b), nor have either been disclosed to inmates, other

than Mr. Jordan.

On two occasions, Mr. Jordan is an inmate at ADX.  He is a prolific writer, having written and submitted

manuscripts, essays, and letters to the editor, fiction and nonfiction, for publication.  Many of Mr.

Jordan's articles and letters have been published in print and on the internet, sometimes

anonymously, and sometimes under a byline or with some other form of attribution.  However,

Mr. Jordan has never acted, requested to act or has been requested to act as a reporter.

On two occasions, Mr. Jordan has been punished for violating 28 C.F.R. § 540.20(b).

Both infractions occurred when Off! magazine published articles under his byline.

Off! magazine is  "the official publication of Off Campus College Meeting at the State

University of New York at Binghamton."  In Spring 2001, "Off!" published an article entitled "The

Social Bonds of the Have-Nots" and credited authorship with the notation "by Mark Jordan."

This article described Mr. Jordan's prison routine, the crimes which led to his imprisonment, and

pending murder charges.  The article was discovered during the screening of incoming mail.  Mr.

Jordan was charged with "Unauthorized Contact with the Public" (Code 327) and "Conduct

which Disrupts or Interferes with the Security or Orderly Running of the Institution" (Code 399).

Following a disciplinary hearing, Mr. Jordan was found guilty of the Code 327 violation, and

---

[13] According to Program Statement No. 1221.66, the Institution Supplement "may not detract from the Bureau directive it implements" and "its purpose is to supplement, not replace, its parent directive."

[14] Mr. Layer testified that 28 C.F.R. § 540.20(b) is being revised to include the language of the Kenney Memorandum; however, no copy of the proposed revisions to this regulation were offered into evidence, and there is no evidence as to how far along in the process such revisions are.

sanctioned.

In Fall 2001, Off! printed an article "by Josef Shevitz"[15] entitled "Beware! Surveillance Society." In this article, Mr. Jordan opined that federal prisoners are subjected to experiments of varying types. Again, this article was discovered during the screening of incoming mail. Mr. Jordan was charged with "Unauthorized Contact with the Public" (Code 327) due to his publication under a byline. Following a disciplinary hearing, Mr. Jordan was found guilty of violating Code 327 based upon his publication under a byline, and sanctions were imposed.[16]

Punishment for violations of 28 C.F.R. § 540.20(b) has been inconsistent. Mr. Jordan was not punished for a third article published in Off!. Two other ADX inmates, Theodore Kaczynski[17] and Thomas Silverstein[18] have published articles under bylines without disciplinary repercussion.

Since early 2006, Mr. Jordan has submitted no writings to the news media for publication (apart from letters to the editor) based upon his belief that he might be punished for violating the byline provisions of 28 C.F.R. § 540.20(b).

---

[15] The name Josef Shevitz is Mr. Jordan's religious birth name.

[16] During the course of this lawsuit, both disciplinary convictions were expunged from Mr. Jordan's record. *See* Order dated May 23, 2006 (**#236**). As a consequence, the Court dismissed, as moot, all of Mr. Jordan's claims based upon past application of 28 C.F.R. § 540.20(b).

[17] Two of his articles were published under a byline in 1999 and 2002.

[18] Two of his articles and his artwork were published under a byline in 1994, while he was housed at USP Leavenworth.

### III.  Analysis

**A.  Standing**

The question of a plaintiff's standing to bring an action is an issue that can be raised at any time.  Once raised, the Court must determine the issue.  *See Board of County Commissioners of Sweetwater County v. Geringer*, 297 F.3d 1108, 1111 (10th Cir. 2002).  In the Final Pretrial Order (**#324**), the BOP contends that Mr. Jordan lacks standing to assert claims on behalf of anyone other than himself.  Mr. Jordan addresses the issue in his trial brief (**#344**).  Although the BOP did not particularly raise the standing issue at trial, the Court now addresses it.

Generally, a plaintiff must have two types of standing, constitutional and prudential.  For constitutional standing, a plaintiff must demonstrate: (1) a concrete and particularized, actual or imminent injury to a legally protected interest of the plaintiff; (2) a causal relationship between the injury and the challenged conduct or action; and (3) a likelihood that the injury will be redressed by a favorable decision.  *See Rector v. City and County of Denver*, 348 F.3d 935, 942 (10th Cir. 2003).  For prudential standing, (1) a plaintiff must assert his own rights, not those of third parties; (2) the plaintiff's claim cannot be a general grievance shared equally and generally by all or a large class of citizens; and (3) the plaintiff's injury must be within the zone of interests the statute or common law claim intends to protect.  *See Geringer,* 297 F.3d at 1112.  However, when a plaintiff with constitutional standing brings a First Amendment overbreadth challenge, such as in this case, the prudential standing requirement is waived.  *Winsness v. Yocom,* 433 F.3d 727, 734 (10th Cir. 2006); *see also D.L.S. v. Utah*, 374 F.3d 971, 976 (10th Cir. 2004).  In cases such as this, a plaintiff may assert the rights of similarly situated third parties, but the scope of the claim is limited to the claim for which the plaintiff has constitutional standing.

Standing is determined at the time of commencement of the action. *Aid for Women v. Foulston,* 441 F.3d 1101, 1109 (10th Cir. 2006). At the time this action was commenced, Mr. Jordan had been punished twice for publishing under a byline in violation of 28 C.F.R. § 540.20(b). As a consequence, he had constitutional standing to challenge the byline publication prohibition in 28 C.F.R. § 540.20(b). However, Mr. Jordan did not have constitutional standing to challenge the regulation's prohibition on acting as a reporter because he had not acted, nor had he been punished for acting, as a reporter.[19]

Because Mr. Jordan's standing at trial is the same as when he commenced the litigation, he has constitutional standing to challenge only the portion of 28 C.F.R. § 540.20(b) that prohibits publishing under a byline. For purposes of this ruling, the Court refers to such portion of the regulation as "the Byline Regulation." Because Mr. Jordan asserts that the Byline Regulation is unconstitutionally overbroad, his challenge is also on behalf of third parties, such as other inmates and the press.

## B. The Byline Regulation

The Byline Regulation unequivocally prohibits an inmate in federal detention from publishing under a byline. There is no exception to the Byline Regulation; if an inmate's writings are published in the news media with attribution, he or she has violated the Regulation and can be punished.

The BOP interprets the Byline Regulation as applying only to publications in the "news

---

[19] The oblique reference by the BOP's Regional Director characterizing Mr. Jordan as the "reporter of an article entitled Off!" does not make him a reporter. Mr. Jordan never wrote an article as a reporter for "Off!"; he was punished only for publishing articles under a byline in Off! magazine.

media," which includes newspapers, news magazines, national and international news services, TV and radio news programs.  In this case, the parties have focused solely upon print media.

To understand the reasons for and effect of the Byline Regulation, it is helpful to reflect upon the steps in the process of publication of a bylined article in the news media.  First, the inmate authors an article and mails it out of the prison to a news media source.  Such outgoing correspondence is treated as "special mail," and is not screened by the BOP.  Presumably, the news media recipient then decides whether to publish the article and whether to attribute to the inmate with a byline.  If the article is published, with or without a byline, the publication might then be sent to a prison as incoming mail.  The prison staff are authorized to screen all incoming mail, including publications, and exclude that which is considered harmful.  It is through this screening process that the BOP has learned of prohibited publications.  Regardless of whether the published article enters the prison, the inmate can be punished for violating the Byline Regulation.

The security purposes articulated by the BOP for the Byline Regulation – prevention of elevating a prisoner's status, exclusion of dangerous content and prevention of any effect upon corrections staff – relate solely or primarily to entry of inmate publications into the prison; the BOP articulates no effects that result from an inmate prospectively sending material to publishers, and indeed, makes no effort to screen such mailings.  The secondary purpose for the Byline Regulation – to prevent inmates from conducting a business while incarcerated – appears to relate to an ongoing relationship between the inmate and the news media, particularly one that generates compensation to the inmate.

In contrast, the effect of the Byline Regulation is to limit or discourage inmates from submitting their writings to the news media for publication (hereinafter, such correspondence is

referred to as "outgoing news media correspondence"). This is because the inmate is punished for the <u>publisher's</u> act of publishing the article under a byline, but the inmate cannot control whether a writing is published or published under a byline once it is submitted to a news media source. It is the news media source, not the inmate, that decides whether the inmate's submission is published and whether a byline is used. Thus, the only way that an inmate can be sure that he or she will not violate the regulation, is not to submit a writing to a news media source for publication in the first place.

The effect of the Byline Regulation is clearly overbroad[20] when compared to its purposes. The Byline Regulation discourages all outgoing news media correspondence, even that which could, but never does, result in a publication or a publication under a byline. It also affects those articles published under a byline that are excluded from entry into the prisons. Not all articles submitted impact prison security in one of the three ways articulated by the BOP, or impact the operation of a business.

The BOP requests that the Court consider the Byline Regulation in conjunction with the ADX Institution Supplement and the Kenney Memorandum. The Court does so because the Institution Supplement and Kenney Memorandum are agency documents which provide authoritative or binding interpretations of the Byline Regulation. *See Forsyth County, Georgia v. Nationalist Movement,* 505 U.S. 123 (1992); *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). Such documents are advisory, giving guidance to prison officials as to when and to what degree an inmate should be punished for violating the Byline Regulation. The documents

---

[20] For First Amendment purposes, a statute or rule is overbroad when it prohibits or punishes a substantial amount of constitutionally protected conduct. *See Jordan v. Pugh,* 425 F.3d 820, 827-28 (10th Cir. 2005).

illustrate the purposes of the Byline Regulation; they clarify that an inmate should only be punished for a bylined publication in the news media if the publication jeopardizes prison security, if the publication presents a risk to the public, or if there are indicia that the inmate is conducting a business.

The Institution Supplement and the Kenney Memorandum were adopted in response to this lawsuit.  They do not, and cannot, change or replace the unequivocal language of the Byline Regulation. They can be withdrawn or further revised at any time.  In addition, neither the Institution Supplement nor the Kenney Memorandum have been published to any inmate other than Mr. Jordan.  Thus, neither the Institution Supplement nor the Kenney Memorandum, fundamentally alters the chilling effect of the Byline Regulation upon an inmate's freedom of expression of ideas to news media[21] and the news media's right to publish such ideas with attribution to the inmate.[22]

Indeed, the chilling effect is demonstrated by Mr. Jordan,[23] who knows of both the Institution Supplement and Kenny Memorandum and whose prior punishment record has been expunged, but who nevertheless refrains from sending outgoing news media correspondence for fear of violating the Byline Regulation.  Arguably, the speech of the more than 198,000 other federal inmates is similarly chilled.  The only way for any inmate to be certain to avoid punishment

---

[21] Even when a proffered writing is not published, it may inform the news media of facts to be investigated or of the perspective of an inmate or inmates, generally.  It could disclose an abuse or a particularly effective program or technique.

[22] The Court notes that attribution to an inmate author helps the public to evaluate the merit and credibility of the ideas or facts advanced.

[23] Only if the Byline Regulation had been amended to incorporate the language of these documents, could the Court consider whether such provisions reduce or eliminate any chilling effect.

is to not submit an article to the news media for publication.

## C. Is the Overbreadth of the Byline Regulation Unconstitutional?

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press[.]"  This Amendment guarantees the right to freedom of expression to individuals and to the press.  *See New York Times Co. v. Sullivan,* 376 U.S. 254, 269 (1964); *see also Smith v. Arkansas State Highway Emp., Local 1315,* 441 U.S. 463, 464 (1979).  Freedom of expression encompasses the publication and dissemination of written materials.  *See, e.g., Cardtoons, L.C. v. Major League Baseball Players Ass'n,* 95 F.3d 959, 969 (10th Cir. 1996).

The Supreme Court has long recognized that inmates do not lose all of their constitutional rights at the jailhouse door; they retain those rights that do not conflict with their incarceration. *See Pell v. Procunier,* 417 U.S. 817, 822 (1974);  *Shaw v. Murphy,* 532 U.S. 223, 229 (2001); *Washington v. Harper,* 494 U.S. 210, 223-24 (1990); *Hudson v. Palmer,* 468 U.S. 517, 523-24 (1984); *Hewitt v. Helms,* 459 U.S. 460, 467 (1983).  Put another way, an inmate's constitutional rights may be limited to the extent necessary to achieve the essential goals of prison security, order, and discipline.  *Bell v. Wolfish,* 441 U.S. 520, 546-47 (1979).  When the rights are limited by a regulation, the person who challenges the regulation bears the burden of proving it is unconstitutional.  *See Overton v. Bazzetta*, 539 U.S. 126 (2003).

### 1. An Analytical Framework

There are two analytical frameworks which are used to determine the constitutionality of a prison regulation.  One is the four-factor analysis prescribed by the Supreme Court in *Turner v. Safley*, 482 U.S. 78, 89-90 (1987).  Under the *Turner* test, courts consider: (1) whether there is a

16

rational connection between the regulation and a legitimate, neutral penological interest; (2) whether there are alternative means for inmates to exercise the specified constitutional right; (3) whether accommodating the inmates' right would have an undue burden on guards, other inmates, and the allocation of prison resources; and (4) whether there are "easy alternatives" to the regulation which could be implemented at a *de minimis* cost. *Turner*, 482 U.S. at 89-90; *see also Wardell v. Duncan,* 470 F.3d 954, 961 (10th Cir. 2006) (quoting from *Beerheide v. Suthers,* 286 F.3d 1179, 1185 (10th Cir. 2002)). The *Turner* test applies to most prison regulations.

Another analytical framework, however, applies to regulations that affect outgoing inmate correspondence. This is a two-factor test, first prescribed by the Supreme Court in *Procunier v. Martinez,* 416 U.S. 396, 413-14 (1974), and iterated in *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989). Under the *Martinez* test, a prison regulation which restrains outgoing inmate correspondence is constitutional only if it: (1) furthers an important or substantial governmental interest unrelated to the suppression of expression; and (2) is no greater than is necessary or essential to protect the particular governmental interest involved.

The Supreme Court adopted the *Martinez* test more than a decade before *Turner*. In *Turner*, the Supreme Court was concerned, *inter alia*, with a prison regulation which restricted correspondence between inmates housed at different institutions. It treated the communication between inmates as communications coming into a prison, rather than as communications leaving a prison. Because inmate-to-inmate correspondence could be used to communicate escape plans and arrange assaults, and the prisons had experienced actual problems with gangs, the Supreme Court upheld the constitutionality of the regulation.

After *Turner*, there was a brief period of uncertainty as to whether the *Martinez* test

17

would continue to apply to regulations affecting inmate correspondence to recipients outside of the prison system.  The Supreme Court clarified this in *Thornburgh*.  In *Thornburgh*, the Supreme Court expressly stated that *Turner* overruled *Martinez* as to writings sent to <u>inmates</u>, but that *Martinez* continued to apply to regulations affecting inmate correspondence sent from a prison to <u>non-inmates</u>.  In doing so, the Supreme Court distinguished between incoming and outgoing correspondence with the following language: "[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials."  *Thornburgh*, 490 U.S. at 413.  Thus, the more restrictive *Martinez* test continues to apply to regulations which restrain an inmate's outgoing correspondence.  *See Thornburgh*, 490 U.S. at 409.

The *Martinez* test has been subsequently applied to outgoing inmate correspondence in the Tenth and Third Circuits.  After *Thornburgh*, the Tenth Circuit applied the two-pronged *Martinez* test to a restriction on outgoing prisoner mail when addressing an assertion of qualified immunity.  *See Treff v. Galetka*, 74 F.3d 191 (10th Cir. 1996).  More recently, the Third Circuit also applied the *Martinez* test to a regulation which prohibited inmates from sending correspondence to former inmates, and found the regulation to be valid.  *See Nasir v. Morgan,* 350 F.3d 366, 371 (3d Cir. 2003).

 Because the primary effect of the Byline Regulation is upon outgoing news media correspondence, the Court concludes that the *Martinez* test is applicable in this case.  In their arguments, the parties focused only upon the *Turner* test,[24] but because the evidentiary basis is the same for both tests, there is no need for supplementation of the record.  In deference to the

---

[24] This implies no criticism of the attorneys, who competently advocated on behalf of their clients.

parties' arguments, the Court has considered the evidence under both the *Martinez* and *Turner* tests, yet reaches the same outcome under both analyses.

### 2. Prison Security

#### a. The "Big Wheel" Security Risk

The BOP is concerned that an inmate who publishes under a byline in the news media can become unduly prominent in the prison community, and that such elevated status and power can be used to intimidate other inmates and corrections staff. When inmates rise to prominence sufficient to influence other prisoners and staff, the BOP characterizes them as "big wheels." The Court defers to the BOP's judgment that a "big wheel" can pose a prison security problem, because this falls squarely within the expertise of correction officials. However, the Court notes that a security risk does not invariably arise because an inmate becomes a "big wheel." To the contrary, the evidence establishes that prison officials encourage some inmates to become "big wheels" in order to showcase them as positive role models.

Addressing questions of whether it is likely that an inmate who publishes under a byline in the news media may become a prison "big wheel," and whether such status may pose a security risk, requires a factual determination. In this regard, the Court looks to evidence of past occurrences and the likelihood of future occurrences. At trial, the BOP presented no evidence of any instance where an inmate who published under a byline in the news media became a "big wheel," or more importantly, became a security risk. The testimony of Mr. Bair, that there is no historical data to support the BOP's concerns, was never rebutted by the BOP. The only historical evidence of inmates who have published under bylines in the news media – Mr. Jordan, Mr. Kaczynski, and Mr. Silverstein – is to the contrary. None were identified as "big wheels" nor

did their bylined news media publications create any identifiable security risk.

Without proof of a past problem, the Court is left to consider whether there is a reasonable probability that if an inmate publishes under a byline in the news media, the inmate could become a "big wheel" who poses a security threat. Again, the evidentiary support for the concern is weak.

The BOP approves and encourages inmates to write and publish in a variety of venues. Inmates may submit drawings, fiction, non-fiction or poetry for publication as "manuscripts," which are reviewed for content by prison officials prior to leaving the prison. In addition, an inmate may submit "letters to the editor" or post comments on the internet without prior review. Arguably, any of the permitted publications could result in similar "big wheel" status. For example, an inmate might publish a book, or series of essays or poems that become popular in or outside of the prison. Letters to an editor might be published by a magazine or newspaper with substantial dissemination, or statements on the internet could be circulated and even picked up by news media sources. Yet as to these circumstances, the BOP perceives no possibility of any "big wheel" security risk.

This suggests that there is something unique about an inmate's bylined news media articles that creates a particular danger of conferring "big wheel" status on an inmate, and a particular danger that such a "big wheel" inmate will pose a security risk. The BOP argues that the security risk is greater because publication in the news media differs from a publication in other venues. There are three alleged differences: (1) the news media has greater credibility (presumably with inmates and prison staff, although this is not clear) than other media; (2) the news media publishes more quickly than other media; and (3) bylined articles in the news media are not subject to staff

review before they are submitted.

Other than Ms. Cruz' and Mr. Shartle's conclusory testimony, however, there is little to support the first two distinctions. No evidence was presented of what news media publications prisoners receive, whether any inmate or member of the corrections staff perceives news media publications differently from other publications, and if so, what differences are perceived. Assuming that the news media has greater credibility with prisoners or staff, such credibility would affect only the author's status, not whether the status creates a security risk. As noted earlier, it is possible that a certain "celebrity" or "big wheel" status might be associated with having a writing published in any forum.[25] But on this record, the Court cannot discern an association between the status gained by any inmate publication and a security risk.

As to the time of publication, the Court is without evidence as to the relative time between submission and publication in various venues, or evidence as to the significance in the timing of publication of bylined articles in the news media as compared to other publications. Indeed, one might speculate as to whether a letter to the editor or a statement on the internet could be published as quickly or quicker than a bylined article. Thus, on this record, the Court cannot find that timing of publication affects the creation of a security risk.

As to the third distinction, it is clear that the BOP treats outgoing news media correspondence differently from outgoing manuscripts. It does not review the content of outgoing news media correspondence (whether bylined or not), because such is treated as "special" outgoing prisoner mail. In contrast, prisoners' manuscripts are reviewed by corrections staff

---

[25] Indeed, an inmate's status might be greater if the inmate were regarded as a reporter, who publishes regularly. However, that portion of the regulation is not before the Court.

before leaving the prison, pursuant to two regulations.[26]  This might be a critical distinction, but the record contains no evidence as to what writings have been excluded upon review, or that unreviewed, outgoing writings of any type present a greater risk to prison security than those that are reviewed.  In addition, the BOP's contention that screening prior to publication is necessary to avoid a security risk is undercut by its failure to restrict or punish publications of "letters to the editor" or postings on the internet, neither of which are reviewed prior to publication.[27]  Finally, the BOP has a safety net for preventing harmful content from coming into a prison, in that all incoming publications are reviewed.  This appears to be sufficient to ameliorate any risk of inflammatory "letters to the editor," and presumably, for harmful manuscripts or bylined news media articles as well.

Based on the evidence presented, the Court finds that the existence of a "big wheel" security risk arising from an inmate's bylined publication in the news media is undocumented and speculative.

### b. Effect of the Content of Bylined News Media Publications on Other Prisoners

The BOP's second security concern is that if an inmate's article published under a byline in the news media reenters a prison, its content could incite violence resulting in injury to the author or other inmates.  The Court defers to the BOP's general contention that content in a publication could cause a security risk, but there is little evidence as to how bylined articles in the news media

---

[26] 28 C.F.R. § 551.82 ("An inmate may mail a manuscript as general correspondence, in accordance with Part 540, Subpart B of this chapter."); 28 C.F.R. § 540.14 (prison staff may review outgoing general correspondence, depending upon the security level of the institution).

[27] It could be that letters to the editor and internet postings are not widely read by inmates and therefore have little impact upon the prison population.  However, the BOP did not make this argument.

present a unique risk.  For example, there is no evidence that content of a bylined news media article is more troublesome than any other publication, or that the content of such article has ever proved dangerous.  Thus, the Court finds that there is a hypothetical risk related to content, but that risk is essentially identical to the risk associated with other permissible inmate publications.

With regard to all publications, the BOP has the authority to screen all incoming publications for content.[28]  This appears to be a well-tailored and effective means to address the security risk.  Indeed, it is through this process that the BOP has learned that Mr. Jordan's articles had been published.  This appears to be an effective and easy alternative to address security concerns, without unduly chilling inmates' right to correspond with the news media.

### c. Effect of a Publication upon Prison Staff

Finally, the BOP contends that a security risk can arise from the effect of bylined publications in the news media upon prison staff.  The BOP argues that the speech of BOP staff might be chilled due to concerns that their statements might be published, and that staff might be intimidated into not exercising appropriate control for fear that their conduct might be reported in a publication.  As to the need for staff to exercise appropriate control of inmates in a prison and how they should do so, the Court defers to the testimony of BOP officials.  The Court also defers to the implicit assumption that if a staff member is afraid to act or defers to an inmate, this may create a security issue.

As to the issue of whether such a security risk is likely to arise from bylined publications in the news media, the Court reviews the evidence presented.  Evidence on this point is limited to the testimony of Ms. Cruz and Mr. Shartle.  Both witnesses made general and conclusory statements

---

[28] 28 C.F.R. § 540.14(a) & (d).

to the effect that staff might feel intimidated by an inmate who publishes articles in the news media. There was no evidence about these witnesses' personal experience, the views of particular corrections officers, past instances where this has occurred in response to any inmate publication or any particular correlation between the risk and bylined publications in the news media.

Arguably, corrections staff may become ineffective in dealing with inmates for any number or variety of reasons. Staff may be intimidated by an inmate who is a gang leader or is particularly muscular or forceful. A staff member may develop an inappropriate relationship with an inmate or group of inmates. As Mr. Bair notes, this is a common problem that is addressed by appropriate staff selection, supervision and training.

The argument that an inmate's publication under a byline particularly creates or exacerbates this risk appears to relate to the threat of publication or the notoriety or influence of the inmate who has published writings. Presumably, staff might fear that their statements or conduct will be revealed outside the prison. The Byline Regulation does not prevent threats of publication and as noted earlier, the evidence does not establish a correlation either between "big wheel" status and bylined publications in the news media, or a distinction between bylined publications in the news media and other publications, such as "letters to the editor" and internet postings. Inmates could refer to prison staff, or prison staff might fear that they would be quoted or described in manuscripts, letters to the editor, or comments published on the internet.

Based on the evidence presented, the Court finds this risk to be speculative and, to the extent it exists, it is not unique to bylined publications in the news media.

### 3. Preventing Inmates from Conducting a Business

The BOP's second justification for the Byline Regulation is to prevent inmates from

conducting a business.  A specific regulation prohibits such activity.[29]  The Court assumes that preventing inmates from conducting businesses while incarcerated is a legitimate penological objective, although no testimony to this effect was presented.

It is worth noting that this argument would carry more weight if the Court were addressing the portion of the Byline Regulation prohibiting inmates from acting as reporters.  The role of a reporter envisions a relationship between the news media and the inmate, for which the inmate is compensated.  But the scope of this lawsuit does not include the reporter portion of the regulation, and the danger of an inmate conducting a business simply because the inmate publishes a writing under a byline in the news media is much more remote.

In assessing whether there is any particular risk associated with an inmate publishing under a byline in the news media, the Court turns to the evidence.  There is no historical evidence that any inmate who published under a byline in the news media did so as a business.  In addition, there was no evidence of how frequently an inmate would have to publish his or her writings in order to be "conducting a business," or why publishing articles under a byline, as compared to publishing via manuscripts, is more likely to create this risk.  Finally, there was no testimony as to why the regulation directly prohibiting the activity of conducting a business is not sufficient to address the concern.

The Court finds that the evidence is insufficient to correlate a bylined publication in the news media with the danger of an inmate conducting a business.  To the extent that there is a risk, the existing regulation prohibiting inmates from conducting a business is an easy and effective alternative to the regulation at issue.

---

[29] 28 C.F.R. § 541.13, Code 408.

### 4. Application of the *Martinez* and *Turner* Tests

### a. *Martinez* Test

Under the *Martinez* test, the Court considers whether the Byline Regulation: (1) furthers an important or substantial governmental interest unrelated to the suppression of expression; and (2) is no greater than is necessary or essential to protect the particular governmental interest involved.  It is beyond cavil, and the parties agree, that maintaining prison security and order is a substantial governmental interest.  The BOP has not explained, exactly, how the conducting of a business by an inmate falls within the rubric of governmental interests, but for the sake of this analysis, the Court assumes that it, too, is an important governmental interest.

Based upon the evidence in the record, the Court cannot find that there is any particular security risk associated with an inmate publishing under a byline in the news media that is not present with other inmate publications.  Given the myriad of similar publishing opportunities available to inmates, the Court finds no correlation between a restriction on bylined news media publications and the BOP's concerns of creating "big wheel" inmates who present a security risk, or a chilling effect on the performance or speech of prison staff.  As to dangerous content, publications in the news media can be regulated in the same manner as the content in other inmate publications, by screening of mail coming into a prison.[30]  On this record, the Court cannot conclude that particularized regulation of an inmate's bylined publications in the news media is essential to any security objective.  More importantly, no justification has been shown for regulating inmates' outgoing news media correspondence – especially when such requests may not be followed by publication, publication under a byline, or entry of the published article into the

---

[30] As stated *supra* at pages 4 and 13, only written publications are at issue in this case.

prison.

The Court also cannot conclude that the Byline Regulation is essential to further the BOP's objective of preventing inmates from conducting a business.  There is, simply, no evidence linking an inmate's outgoing news media correspondence to an inmate conducting a business.  Moreover, the BOP already has a carefully tailored regulation which prohibits an inmate from conducting a business.[31]  In addition, no justification has been shown for regulation of an inmate's outgoing news media correspondence that does not result in an inmate conducting a business.

For these reasons, applying the *Martinez* test, the Byline Regulation is unconstitutional.

### b. *Turner* Test

Under the *Turner* test, this Court considers: (1) whether there is a rational connection between the Byline Regulation and a legitimate, neutral penological interest; (2) whether there are alternative means of exercising the asserted constitutional right; (3) whether accommodating the asserted right will have an undue burden on guards, other inmates, and the allocation of prison resources; and (4) whether there are "easy alternatives" which can be implemented at a *de minimis* cost.

The first *Turner* factor looks at the linkage between the regulation and the penological objective it is intended to advance.  The government's objective must be both legitimate and neutral, without regard to the contents of the expression.  If there is no logical connection between a regulation and the BOP's asserted objective, the regulation becomes arbitrary.  *Id.* at 89-90.  If there is no rational relationship between a regulation and a penological interest, the determination is dispositive, and the Court need not look at any other factor.  *See Jacklovich v. Simmons*, 392

---

[31] 28 C.F.R. § 541.13, Code 408.

F.3d 420, 427 (10th Cir. 2004); *see also Boles v. Neet*, 486 F.3d 1177 (10th Cir. 2007) (characterizing first *Turner* factor as an essential requirement).

The second *Turner* factor – whether there are alternative means of exercising the asserted constitutional right – does not require that the alternatives be ideal, only that they be available. *See Wardell*, 470 F.3d at 961. In the context of this element, the "right" is viewed both sensibly and expansively. *Thornburgh,* 490 U.S. at 417.

The third *Turner* factor looks at how accommodating the inmate's asserted right would impact prison resources, guards and other inmates. *Turner*, 482 U.S. at 90. This factor addresses the monetary cost of accommodating the right, as well as how such accommodation would affect prison staffing and officers' job duties. *Cf. Wardell*, 470 F.3d at 962.

The fourth *Turner* factor focuses upon alternative ways to accomplish the prison's objective. The absence of ready alternatives can be evidence of the reasonableness of a prison regulation. In contrast, if there are obvious, easy alternatives to a regulation, the regulation may not be reasonable and instead an "exaggerated response to prison concerns." *Turner,* 482 U.S. at 90. This is not a least restrictive alternative test; prison officials need not address every conceivable method of accommodating an inmate's constitutional complaint. *Id.* at 90-91. However, if the inmate can point to an alternative that fully accommodates his or her rights at *de minimis* cost to valid penological interests, then this factor weighs against the constitutionality of the regulation. *Id.* at 91.

Here, the first, third and fourth factors are most important.[32] The Court accepts that

---

[32] For purposes of the analysis, the Court will assume that an inmate's freedom of expression can be exercised by publishing in a variety of venues.

maintaining prison security is a legitimate and neutral penological interest.  However, for the reasons discussed previously, the Court concludes that there is no logical connection between the blanket restriction on outgoing news media correspondence and prison security.  There is insufficient evidence to establish a particular security risk associated with bylined articles published in the news media as compared with any other permissible form of publication.  Moreover, as with all other publications, particular content may give rise to a security risk only once the publication enters the prison.  But as to entry of all publications into the prison, the BOP has adequate authority to screen and exclude dangerous content.

Assuming that preventing inmates from conducting a business is a legitimate, penological interest, there is also no particularized logical connection between such objective and a blanket prohibition on outgoing news media correspondence.  There is insufficient evidence that outgoing news media correspondence has resulted, or is likely to result, in an inmate conducting a business that cannot be addressed by existing regulations.

The existing regulations that provide for screening of incoming publications and prohibiting an inmate from conducting a business are obvious, well-tailored, and easy alternatives to the Byline Regulation.  Mr. Shartle testified that without the Byline Regulation, more than 198,000 inmates might send outgoing news media correspondence.  This may be true, but it is not outgoing correspondence that creates any burden on the prison system; it is incoming publications.  As to this, there is no evidence that even offers a guess as to how many inmate submissions might be published, how many more publications might have to be reviewed by prison officials or at what cost.  Thus, the Court also concludes that the Byline Regulation fails to satisfy the first, third and fourth requirements of the *Turner* test.

Accordingly the Court concludes that the Byline Regulation violates the First Amendment rights of Mr. Jordan, other inmates in federal institutions, and the press.

**IT IS THEREFORE ORDERED** that judgment shall enter in favor of the Plaintiff, Mark Jordan, and against the Defendants, Michael V. Pugh, J. York, R.E. Derr, B. Sellers, and Stanley Rowlett, in their official capacities:

(1) **DECLARING** that the language of 28 C.F.R. § 540.20(b), "The inmate may not . . . publish under a byline", violates the First Amendment to the United States Constitution; and

(2) **ENJOINING** the Federal Bureau of Prisons from punishing any inmate for violation of 28 C.F.R. § 540.20(b)'s provision that: "The inmate may not . . . publish under a byline."

**IT IS FURTHER ORDERED** that the Clerk of Court is directed to close this case.

Dated this 9th day of August, 2007

**BY THE COURT:**

_Marcia S. Krieger_
_____

Marcia S. Krieger
United States District Judge